J-S32015-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: M.E.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.M., FATHER | |
| | No. 3655 EDA 2015 |

Appeal from the Decree entered November 23, 2015,
in the Court of Common Pleas of Philadelphia County,
Family Court, at No(s):
CP-51-AP-0000412-2015,
CP-51-DP-0002141-2013

BEFORE:  BOWES, MUNDY, and PLATT*, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED MAY 19, 2016**

E.M. ("Father"), appeals the November 23, 2015 decree involuntarily terminating his parental rights to his son, M.M., born during February 2013.[1] We affirm.

The trial court set forth the following factual and procedural history of this case, in part:

> This family was known to DHS [the Philadelphia Department of Human Services] long before [M.M.] became involved in dependency proceedings.  When [M.M.] was born[,]. . . [Mother] was a minor under DHS supervision with her aunt.  At a September 17, 2013, hearing the [c]ourt ordered that Mother be

---

\* Retired Senior Judge assigned to the Superior Court.

[1] By separate decree dated November 23, 2015, the trial court voluntarily terminated the parental rights of L.A. ("Mother").

placed in an appropriate mother-baby setting with DHS. . . . Immediately after the hearing[,] Mother absconded and her whereabouts were unknown until September 23, 2013. On that date[,] she contacted DHS and asked to be [returned to place[ment]. . . . On October 24, 2013, DHS filed a petition to remove [M.M.] from Mother's care. At a November 4, 2013 . . . hearing [M.M.] was adjudicated dependent and committed to DHS based on the present inability of Mother to provide appropriate care. . . . From [M.M.]'s birth until Mother left [M.M.] in the care of DHS, Father [had scant] contact with [M.M.]. He only saw [M.M.] from time to time, when Mother brought [M.M.] around. Father's last visit with [M.M.] was at [his] first birthday. He never initiated any contact with [M.M.]. Mother confirmed Father's [identity] in April 2015.

Father was incarcerated in the Curran Fromhold Correctional Facility ("CFCF") from October 10, 2014, when he was convicted of drug possession with a firearm. Father had prior arrests for gun and drug charges. He was sentenced to two and a half years imprisonment, with five years of probation upon release. Father is serving his sentence in a state facility in Camp Hill, Pennsylvania.

Trial Court Opinion, 1/15/16, at 1–2 (citations to record omitted).

On June 26, 2015, DHS filed a petition for the involuntary termination of Father's parental rights and a petition for goal change to adoption. A hearing was held on October 5, 2015, when DHS presented Father's testimony by telephone from prison, and Crystal Zuggi, the Community Umbrella Agency ("CUA") case manager. These same witnesses testified at a November 23, 2015 hearing.

By decree dated November 23, 2015, the trial court involuntarily terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2),

(5), (8), and (b).[2]    In addition, by permanency review order dated November 23, 2015, the trial court changed M.M.'s placement goal to adoption.  Father timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3] The trial court filed its Rule 1925(a) opinion on January 15, 2016.

On appeal, Father raises the following issues for our review:

1. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [F]ather . . . pursuant to 23 Pa.C.S. [§] 2511(a)(1) where [F]ather presented evidence that he was not [informed] until recently that he was the potential father and only received the paternity tests results several weeks before the termination hearing and therefore was not

---

[2] The trial court explained that the involuntary termination petition did not include § 2511(a)(8) as a ground for termination.  Trial Court Opinion, 1/15/16, at 1.  Therefore, on December 9, 2015, following Father's notice of appeal, the trial court amended the decree by removing § 2511(a)(8) as a basis for the termination of Father's parental rights.  A trial court may modify an order to correct a clerical error that is clear in the record even though it no longer retains jurisdiction.  **See Stockton v. Stockton**, 698 A.2d 1334, 1337 n.3 (Pa.Super. 1997).  Moreover, to the extent that the trial court relinquished its jurisdiction to amend the decree following Father's notice of appeal to this Court, the court's mistaken reference to § 2511(a)(8) is harmless insofar as DHS need only establish one of the statutory grounds for termination under § 2511(a) and the record supports the court's finding that the agency satisfied its burden of proof under §2511(a) (1).  Thus, no relief is due.

[3] While Father purported to file an appeal from the goal change order, he failed to present any challenges to it in his Rule 1925(b) statement or his brief. Thus, we do not address that claim herein.  **See** Pa.R.A.P. 1926(b)(4)(vii) (Issues not included in the Statement and/or not raised in accordance with the provisions of paragraph (b)(4) are waived); **In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) ("Where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

provided with an opportunity to perform his parental duties for his child[?]

2. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [F]ather . . . pursuant to 23 Pa.C.S.[] [§] 2511(a)(2) where [F]ather presented evidence that he will remedy his situation by meeting his goal of contact with his son and will be released from prison in the near future and until he is released his sister is able to care for his child and has the present capacity to care for his child in his home with his current wife[?]

3. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [F]ather . . . pursuant to 23 Pa.C.S. [§] 2511(a)(5) where evidence was provided to establish that the child . . . was not in [F]ather's care when he was originally placed by DHS, and furthermore, evidence was presented to show that [F]ather is capable of caring for his child[?]

4. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [F]ather . . . pursuant to 23 Pa.C.S. [§] 2511(a)(8) where evidence was presented to show that Father is capable of caring for his child even though he was never provided with reasonable efforts for reunification with his son[?]

5. Whether the trial court erred and/or abused its discretion by terminating the parental rights of [F]ather . . . pursuant to 23 Pa.C.S. [§] 2511(b) where evidence was presented that established the child . . . never had a chance for a close bond with his father and also has never been allowed to have a very close relationship with his paternal aunt[?] Both [F]ather and paternal aunt have never been given a chance to establish this bond.

Father's brief at 7.

We consider Father's issues mindful of our well-settled standard of review.

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and

- 4 -

credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa.Super. 2009).

This Court need only agree with any one subsection of § 2511(a), along with § 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). We conclude that the trial court in this case properly terminated Father's parental rights pursuant to § 2511(a)(1) and (b), which provide as follows:

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> . . . .
>
> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We have explained,

> To satisfy the requirements of section 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform

parental duties. ***In re Adoption of R.J.S.***, 901 A.2d 502, 510 (Pa.Super. 2006). In addition,

> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to [s]ection 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.

***In re Adoption of Charles E.D.M.***, 550 Pa. 595, 708 A.2d 88, 91 (Pa. 1998).

> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

***Id***. at 92 (citation omitted).

***In re Z.S.W.***, 946 A.2d 726, 730 (Pa.Super. 2008).

Parental duty is defined as follows:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

*In re B.,N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004).

With respect to the termination of parental rights of incarcerated persons under § 2511(a)(1), in *In re Adoption of S.P.*, 47 A.3d 817 (Pa. 2012), our Supreme Court discussed *In re Adoption of McCray*, 331 A.2d 652 (Pa. 1975), as follows:

Applying in *McCray* the provision for termination of parental rights based upon abandonment, now codified as § 2511(a)(1), we noted that a parent "has an affirmative duty to love, protect and support his child and to make an effort to maintain communication and association with that child." *Id*. at 655. We observed that the father's incarceration made his performance of this duty "more difficult." *Id*.

*S.P.*, 47 A.3d at 828. The *S.P.* Court continued:

[A] parent's absence and/or failure to support due to incarceration is not conclusive on the issue of abandonment. Nevertheless, we are not willing to completely toll a parent's responsibilities during his or her incarceration. **Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison in continuing a close relationship with the child**. Where the parent does not

- 8 -

exercise reasonable firmness in declining to yield to obstacles, his other rights may be forfeited.

[**McCray**,] at 655 (footnotes and internal quotation marks omitted).

**S.P.**, **supra** (emphasis added).

Instantly, Father argues that his conduct does not warrant the termination of his parental rights under § 2511(a)(1) because he "only very recently learned the results of paternity test." Father's brief at 15. In addition, Father asserts that his only established Family Service Plan ("FSP") goal was to maintain contact with his son, "which he had no control over." **Id**. Further, Father asserts that he was not provided an attorney until June of 2015. We reject Father's claims.

To the extent that Father implies he had no obligation to perform his parental duties until he received his paternity test results, we disagree. Crystal Zuggi, the CUA case manager, testified she became involved with this family in April of 2015, and Mother first named Father as M.M.'s biological father during a court hearing that same month. N.T., 10/5/15, at 2; N.T., 11/23/15, at 8. Ms. Zuggi testified she spoke to Father on May 1, 2015, at which time he requested a paternity test. N.T., 11/23/15, at 9-10. She testified she informed Father of the results of the paternity test on September 24, 2015. N.T., 10/5/15, at 30.

In **Z.S.W.**, **supra**, this Court rejected the rationale of the trial court in denying the involuntary termination petition under § 2511(a)(1) because the

- 9 -

father "was only required to attempt the level of parenting consistent with his and the agency's knowledge of parentage." ***Z.S.W.***, 946 A.2d at 731 (internal quotations omitted). We explained, "[t]he crux of the trial court's statement is that [the father] was not required to perform any parental duties until he received the results of the paternity test. To adopt the trial court's rationale would relieve all fathers of their parental duties until their parentage was confirmed by a paternity test." ***Id***. As such, we reversed the order and remanded the case.

Presently, the record demonstrates that Father was aware of his possible paternity of M.M. before his incarceration in October of 2014. N.T., 11/23/15, at 23. Father testified that he attended M.M.'s first birthday party during 2014, while his son was in mother/baby placement with Mother. ***Id***. at 16. Father explained that when he argued with Mother, she would attempt to provoke him by stating that M.M. was not his child. ***Id***. Chastened by the rebuke, Father described feeling that "[he would] still be there for the child [but] at the same time in your heart you still want to get [a] DNA test, that's all I wanted." ***Id***. at 17. On cross-examination by the Child Advocate, Father testified that he knew M.M. was in placement prior to his incarceration, but he still did not seek visitation. N.T., 10/5/15, at 18-19. He proffered no justification for neglecting to request visitation. Indeed, upon inquiry on why he did not call DHS and ask for visitation, Father responded, "I didn't — I just didn't." ***Id***. at 19. Likewise, Father conceded

that his interactions with his son were minimal. He explained, "[I saw M.M.] a couple times when [Mother] brung [sic] him around. . . ." *Id*. at 18.

As it relates with Father's lack of compliance with his goals under the Family Service Plan ("FSP"), Ms. Zuggi testified that, in April 2015, she sent FSP objectives to Father that included "to make outreach to [M.M.], to have a relationship with [M.M.]." N.T., 10/5/15, at 34. Ms. Zuggi suggested that Father accomplish this objective through telephone contact with M.M. or by writing letters to his son. *Id*. at 35. Ms. Zuggi rated Father's compliance with his FSP objectives as "none." *Id*. Indeed, she noted that, since April of 2015, Father failed to provided her with any cards to give to M.M. *Id*. at 26. Further, Ms. Zuggi observed that, although she provided his prison counselor with her contact information in April of 2015, Father never initiated contact with her. *Id*. at 24–25. Finally, she highlighted that Father did not request pictures of M.M. until September 24, 2015, the date that she informed Father of the paternity test results. *Id*. at 30, 33.

Based on the foregoing evidence, we discern no abuse of discretion by the trial court in terminating Father's parental rights pursuant to § 2511(a)(1). At best, Father displayed, "a merely passive interest in the development of" M.M. throughout his life despite the knowledge that M.M. may be his son. *In re B.,N.M.*, *supra*. Father shirked **all** of his parental duties prior to his incarceration. He did not have any contact with M.M. or Mother while the two remained in DHS' mother/baby foster care, ostensibly

to avoid condemnation for having impregnated fifteen-year-old Mother while he was approximately twenty-three. Thereafter, Father only saw his son on the few occasions that Mother initiated contact, and he has not had any contact with the child since February 2014.

Even after Ms. Zuggi contacted Father in prison during May 2015, Father showed little, if any, interest in M.M. He did not initiate further contact with Ms. Zuggi, and he did not utilize resources while in prison to demonstrate interest in M.M. The sum total of Father's attentiveness to his son is that, upon the confirmation of paternity during September of 2015, Father requested photographs of the child. As such, the record demonstrates that Father disregarded the needs of his son and failed to perform his parental duties both before and during his incarceration, which is far in excess of the requisite six-month statutory period. Thus, the trial court did not err in finding that DHS established by clear and convincing evidence the statutory grounds to terminate Father's parental rights pursuant § 2511(a)(1).

In his final issue, Father argues the trial court abused its discretion in terminating his parental rights pursuant to § 2511(b) because M.M. "has never been provided the opportunity to develop a bond with [him]", or "to

develop a relationship with his stepmother, siblings and paternal aunt."[4]

Father's brief at 18. We disagree.

With respect to § 2511(b), this Court has explained the requisite analysis as follows:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id*. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. *In re K.Z.S.*, 946 A.2d 753, 762-63 (Pa.Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. *Id*. at 63.

*In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010).

Our Supreme Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013). Moreover, the Court directed that, in weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id*. at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of

---

[4] Father testified that he married on October 2, 2014, and that he has four daughters from prior relationships, who reside in South Carolina. N.T., 11/23/15, at 21-22. Further, Father testified that he has a sister, with whom he would like M.M. to reside. N.T., 10/5/15, at 21-22.

years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id*.

In this case, there is no evidence that a bond exists between M.M. and Father. Indeed, Ms. Zuggi testified that M.M. is not able to identify anyone as his father. N.T., 10/5/15, at 27. She stated that M.M. has resided with the same foster mother since he was "a few months old," and that M.M. shares a bond with her. *Id*. at 27-28. Further, Ms. Zuggi observed that M.M. has resided in the same pre-adoptive home for approximately two years. *Id*. Finally, she opined that, if M.M. was removed from his current placement, he would suffer harm. *Id*. at 28. Based on the evidence in the certified record, we reject Father's argument with respect to § 2511(b). Father's failure to perform his parental duties during M.M.'s lifetime impeded the development of any bond between him and his son. Accordingly, we affirm the decree terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/19/2016

- 14 -